UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL COREY HENDERSON,

                Plaintiff,          Civil Action No. 13-11503
                                      Honorable Julian Abele Cook
                                      Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 12]**

Plaintiff Michael Corey Henderson ("Henderson") brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [11, 12], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

I.      **RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Henderson is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [12] be DENIED, Henderson's Motion for Summary Judgment [11] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED to the ALJ for further proceedings consistent with this Recommendation.

II.    **REPORT**

A.    **Procedural History**

On March 23, 2010, Henderson filed applications for DIB and SSI, alleging disability beginning on March 6, 1981 (his date of birth).[1]  (Tr. 206-16).  His claims were initially denied on July 8, 2010.  (Tr. 93-101).  Thereafter, Henderson filed a timely request for an administrative hearing, which was held on May 24, 2011, before ALJ Henry Perez, Jr.  (Tr. 27-61).  Henderson (represented by attorney Diane Kwitoski) testified at the hearing, as did vocational expert Michele Robb.  (*Id.*).  On July 22, 2011, the ALJ issued a written decision finding that Henderson is not disabled.  (Tr. 12-22).  On January 29, 2013, the Appeals Council denied review.  (Tr. 1-4).  Henderson filed for judicial review of the final decision on April 2, 2013. (Doc. #1).

B.    **Background**

1.    *Disability Reports*

In a March 23, 2010 disability field office report, Henderson asserted that he has been disabled since birth (on March 6, 1981).  (Tr. 227).  During a face-to-face interview, the claims examiner noted that Henderson had difficulty talking, understanding, and concentrating.  (Tr. 229).   The claims examiner further stated:   "The claimant has a low level of cognitive comprehension.  He can communicate on a casual level but I had to explain and emphasize [] things throughout the interview."  (Tr. 230).

In an undated disability report, Henderson indicated that his ability to work is limited by the following conditions:   "learning disability" and "cognitively disabled."   (Tr. 232).   He reported that he had been employed on a part-time basis as a bagger in a grocery store from 1998 through March of 2000.  (Tr. 234).  He stopped working not because of his medical condition,

---

[1] Previously, Henderson had received child disability benefits.  (Tr. 228).

but because he was incarcerated.  (Tr. 233).

In an undated function report, Henderson reported that he lives in a boarding house.  (Tr. 239).  When asked how his conditions limit his ability to work, Henderson indicated the following:  "I am slow I been in special Ed I was born bolegged [sic] back spasm."  (Tr. 239).  He is able to prepare his own meals, attend to his personal care, perform household chores, and go shopping.  (Tr. 240-41).  He is able to use public transportation but does not have a driver's license.  (Tr. 242).  Henderson cannot pay bills, count change, or handle a checking or savings account.  (*Id.*).  He watches television with others in his boarding house on a regular basis and does not having any problems getting along with people.  (Tr. 243-44).

When asked to identify functions that are impacted by his conditions, Henderson checked standing, memory, and understanding.  (Tr. 244).  He indicated that he sometimes does not understand what people say and must ask them to repeat it.  (*Id.*).  When asked how well he follows written and spoken instructions, Henderson said "very good."  (*Id.*).  He does not handle stress well, however.  (Tr. 245).

### 2.   *Hearing Testimony*

At the May 24, 2011 hearing before the ALJ, Henderson was thirty years old.  (Tr. 30).  He testified that he had served nine years in prison for criminal sexual conduct and, at the time of the hearing, he was still on a tether.  (Tr. 31).  He further testified that he went through therapy while in prison (and continued to attend therapy sessions while on parole).  (Tr. 31-32).  Henderson also testified that he took special education classes while in school and still has trouble with reading, spelling, and math.  (*Id.*).  At the time of the hearing, Henderson was working at Jay Shop on a part-time basis, putting auto parts inside kits.  (Tr. 32).  He indicated that he has difficulty with this job because he cannot sit or stand for very long without

3

experiencing back and leg pain.  (Tr. 32-33).

Rodney Whiters, Henderson's supervisor at Jay Shop, also testified at the administrative hearing.  According to Whiters, Jay Shop is a vocational rehabilitation facility that provides services to consumers referred by the State of Michigan Rehabilitation Agency.  (Tr. 45). Whiters testified that Henderson had been working in this "sheltered work" situation for several weeks.  (Tr. 46).  Whiters testified that, despite the fact that Henderson has been assigned the "simplest task" at Jay Shop, he still has difficulty performing his job.  (Tr. 53-54).  According to Whiters, it would be difficult for Henderson to move to competitive employment "because of his challenges."  (Tr. 46-47).

### 3.    Medical and Educational Records

Henderson's school records indicate that he received IQ testing several times over the years, which yielded the following results:

|  | April 1990 WISC-R | May 1993 WISC-III | April 1996 WISC-III |
|---|---|---|---|
| Verbal IQ | 64-71 | 56-66 | 54-64 |
| Performance IQ | 81-90 | 74-88 | 75-89 |
| Full Scale IQ | 70-76 | 64-73 | 63-72 |

(Tr. 314).  In May of 1999, Henderson's school psychologist noted that the "results of all three of these evaluations were fairly consistent."  (Tr. 313).  Testing completed in 1999 indicated that Henderson (then an eighteen-year-old high school student) was performing at the third grade level in reading, spelling, and math.  (Tr. 313-14).  In the words of Henderson's school psychologist, he continued to "display a severe discrepancy in written expression, basic reading skills, and math calculation."  (Tr. 314).  By taking a heavy load of special education classes (twenty out of thirty hours per week), however, Henderson was able to graduate from high school with a grade point average of 2.942, which ranked him 34th out of the 210 students in his graduating class.  (Tr. 290, 298).

Henderson was subsequently incarcerated from 2000 through 2009 for criminal sexual conduct after he molested a five-year-boy in his adoptive family.  (Tr. 322, 326).  Thus, the record includes treatment notes compiled while Henderson was in prison.  (Tr. 319-43).  On November 22, 2000, Henderson underwent an evaluation with a psychologist, who indicated that Henderson had lived with his biological mother (who abused and neglected him) for the first year of his life before he was placed into foster care.  (Tr. 326).  He lived in foster care for approximately three years until he was adopted.  (*Id.*).  Henderson reported that he had worked briefly as a supermarket bagger before he was arrested.  (*Id.*).  The psychologist noted that Henderson had been evaluated in September of 2000 and found competent to stand trial, but he presented with a "below normal range of intellectual development."  (Tr. 326-27).  During this initial interview, Henderson reported that his adoptive mother "had basically taken care of him," doing all of the cooking and cleaning, and managing the money that he earned as a bagger.  (Tr. 327).  When asked what his interests were, Henderson indicated "pornography, coloring, and comic books."  (*Id.*).  According to the psychologist, Henderson has "borderline intellectual functioning."  (*Id.*).

On June 3, 2004, psychologist Edward Bujdos, Jr., MA/LLP, completed a "Therapy Termination Report," indicating that Henderson had completed the sex offender psychotherapy program while in prison.  (Tr. 321-23).  Dr. Bujdos diagnosed Henderson with same sex pedophilia and personality disorder and assigned a Global Assessment of Functioning ("GAF")[2] score of 60.  (Tr. 321-23).  In the Conclusions/Recommendations section of his report, Dr. Bujdos stated:

---

[2]  GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

> Given Mr. Henderson's propensity to have difficulty in most areas of socialization, he will require further case management and therapeutic contact to assist him in day to day decisions. This individual has "no place to go." He is 23 years of age, has no supportive family environment, and given his age no longer will be provided services by FIA. He will require greater social service services than would be normally expected of released individuals. He will not request such, but these need to be discussed and provided. It is known that the MDOC will provide 2 years of continued therapy upon parole. Other services such as housing, vocational training and identity, will be required for Mr. Henderson …. He is a very under socialized, special education/learning disabled individual.

(Tr. 323).

In August of 2008, Gary Rutledge performed a psychological evaluation of Henderson at the request of the Michigan Department of Corrections Parole Board. (Tr. 330-32). Mr. Rutledge indicated that "because of several opinions that intellectual functioning would likely influence [Henderson's] success in society, the Wechsler Abbreviated Scale of Intelligence (WASI) was administered to provide a more objective estimation of this area of his functioning." (Tr. 331). On this test, Henderson's Verbal Scale IQ was "in the borderline to low average range," his Performance Scale IQ was "in the mild mental retardation range," and his Full Scale IQ was "in the mild to borderline mental retardation range." (*Id.*). Mr. Rutledge diagnosed Henderson with pedophilia, borderline intellectual functioning, and personality disorder, assigned a GAF score of 60, and concluded that:

> The picture that emerges from available data suggests an individual with limited cognitive capabilities, little or no apparent support system in society, limited occupational skills and a significant need for external guidance and support for establishing himself and continuing his treatment. He went from an adoptive home which presumably provided guidance and structure, to prison where significant guidance (supervision) and structure has been provided. To place him in society without necessary support and structure will likely result in a less than an optimal outcome.

(*Id.*).

After he was released from prison, Henderson underwent treatment at Community

6

Programs, Inc. as a condition of his parole. (Tr. 362-651). These records include several GAF assessments. On August 20, 2009, Yelena Gouseinov assigned Henderson a GAF score of 55. (Tr. 471). On March 9, 2010, Dawn Fisher, L.L.P., issued an "Unsuccessful Termination Report," indicating that Henderson had been terminated from the sex offender treatment program on January 25, 2010, because he had been incarcerated for 30 days for a parole violation. (Tr. 465-66). Ms. Fisher assigned Henderson a GAF score of 55 at that time. (Tr. 465). A March 30, 2010 report indicates that Henderson re-entered the sex offender treatment program, and his GAF score was 55 at that time. (Tr. 474-78). On May 1, 2010, Ms. Fisher indicated that Henderson "struggled with comprehending topics" during therapy sessions and "continues to appear childlike and to be easily swayed by others." (Tr. 531). On June 25, 2010, social worker Robin Heideman noted that Henderson "struggles with socializing and has difficulty staying on task," saying that "cognitive deficits [were] apparent." (Tr. 605). On October 26, 2010, and November 15, 2010, Henderson was assigned GAF scores of 52 by Jill Norbury, L.L.P. (Tr. 483, 495). Ms. Norbury indicated that Henderson's intelligence was "estimated to be below normal limits," but said that he displayed good judgment and impulse control during the interview. (Tr. 482). She also noted that he "displays marked impairment in cognitive abilities, specifically problem-solving the gap between his wishes/needs and reality." (*Id.*).

Henderson underwent a consultative psychological examination with Firoza Van Horn, Psy. D., on June 25, 2010. (Tr. 344-52). Henderson reported that he received Social Security disability benefits from age 4 until age 19, when he was charged with criminal sexual conduct. (Tr. 344). Henderson further reported that he worked as a supermarket bagger for a short time before he was "locked up." (Tr. 346). Dr. Van Horn conducted IQ testing and reported a verbal comprehension score of 72, a perceptual reasoning score of 73, and a full scale IQ score of 70

(all in the borderline range of intellectual functioning).  (Tr. 349).  Dr. Van Horn considered the

test scores "reliable for interpretation" and stated, "Mr. Henderson's intellectual level is

consistent with previous performance and there is a likelihood it is not going to change over

time."  (Tr. 348-49).  Dr. Van Horn diagnosed Henderson with pedophilia, borderline intellectual

functioning, and antisocial adult behavior and assigned a GAF score of 66.  (Tr. 350).  Dr. Van

Horn opined that Henderson's abilities to relate to others; to understand, remember, and carry out

simple, repetitive tasks; and to withstand normal work pressures were "within normal limits."

(*Id.*).  She further opined that Henderson's ability to maintain concentration, persistence, and

pace and to perform routine tasks is mildly impaired.  (*Id.*).

On July 6, 2010, Dr. Dennis Beshara reviewed Henderson's medical records and

completed a Psychiatric Review Technique and Mental Residual Functional Capacity

Assessment.  (Tr. 87-92).  Dr. Beshara opined that Henderson has mild limitations with respect

to his activities of daily living and maintaining social functioning, and moderate limitations in

his ability to maintain concentration, persistence, or pace.[3]  (Tr. 87).  Dr. Beshara also concluded

that Henderson is "capable of performing unskilled work."  (Tr. 90).

After his release from prison, Henderson also received some assistance with literary skills

from Jane Stewart, Ph.D.  (Tr. 354).  According to Dr. Stewart, on her initial testing, Henderson

was reading at the second grade level, spelling at the first grade level, and performing math at the

kindergarten level.  (*Id.*).  On January 30, 2011, Dr. Stewart noted that Henderson was "always

pleasant and co-operative," and said that, over the fifteen months she had been working with

---

[3]  Specifically, Dr. Beshara opined that Henderson is moderately limited in the ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; work in coordination with or in proximity to others; complete a normal workday and workweek without interruptions from psychologically based symptoms; and respond appropriately to changes in the work setting.  (Tr. 89-90).

him, Henderson had increased his reading and spelling to the fourth grade level, and his math to the fifth grade level. (*Id.*). However, she explicitly stated that Henderson "has difficulty just getting through the day." (*Id.*).

The record also contains a January 31, 2011, letter from Henderson's parole officer. (Tr. 274). In that letter, Agent Thomas Mize indicated that Henderson "has been making ample efforts to improve his employment and education skills while on parole by attending weekly job club meetings and attending a cognitive training class twice a week." (*Id.*). Agent Mize further indicated, though, that despite Henderson's efforts, "he still faces significant difficulties in dealing with everyday situations and overcoming his cognitive shortcomings." (*Id.*).

### 4.   *Vocational Expert's Testimony*

Michele Robb testified as a vocational expert ("VE") at the hearing before the ALJ. (Tr. 55-59). The ALJ asked the VE to imagine a claimant of Henderson's age, education, and work experience, who could perform work at all exertional levels, but with the following nonexertional limitations: simple job assignments that require only routine production and stress levels for an individual functioning at the fourth grade level; only occasional contact with the public; and no contact with children. (*Id.*). The VE testified that the hypothetical individual would be capable of working in the positions of packer (3,200 jobs in the lower peninsula of Michigan), inspector (2,100 jobs), and machine tender (4,200 jobs). (Tr. 57-58). Upon further questioning, the VE testified that if the hypothetical individual needed a "job coach" (or some other type of sheltered work situation) in order to meet the requirements of a job, he would be precluded from competitive work. (Tr. 59).

### C.   **Framework for Disability Determinations**

Under the Act, DIB and SSI are available only for those who have a "disability." *See*

9

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

D.      **The ALJ's Findings**

Following the five-step sequential analysis, the ALJ found that Henderson is not disabled under the Act.  At Step One, the ALJ found that Henderson has not engaged in substantial gainful activity since March 6, 1981, the alleged onset date.  (Tr. 14).  At Step Two, the ALJ found that Henderson has the severe impairments of "learning disorder and cognitive disorder." (Tr. 14).  The ALJ also found at Step Two that Henderson's personality disorder, pedophilia, and bowleggedness do not cause more than a minimal limitation on his ability to perform basic mental work activities and, thus, are non-severe.  (Tr. 14-15).  At Step Three, the ALJ found that Henderson's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 15-17).

The ALJ then assessed Henderson's residual functional capacity ("RFC"), concluding that he is capable of performing work at all exertional levels, with the following nonexertional limitations:   he is limited to work with simple job assignments that require only routine production and stress levels; only occasional contact with the public; and no contact with children.  (Tr. 17-20).  At Step Four, the ALJ determined that Henderson has no past relevant work.  (Tr. 21).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Henderson is capable of performing a significant number of jobs in the national economy and, thus, he is not disabled under the Act.  (Tr. 21-22).

E.      **Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact

unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).   Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).   There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is

supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

At Step Three of his analysis, the ALJ concluded that Henderson's "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.05, 12.08, and 12.09." (Tr. 15). Before this Court, Henderson advances only one argument, that the ALJ erred in concluding that he does not meet the criteria of Listing 12.05 (mental retardation). (Doc. #11 at 11-20). Henderson's Step Three argument is potentially dispositive, because an adult whose impairments meet or medically equal the criteria of a Listing is presumed to be under a disability and is granted benefits without further evaluation. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 649 (6th Cir. 2006) (en banc). As set forth in greater detail below, the Court finds that the ALJ's conclusion that Henderson does not meet Listing 12.05 is not supported by substantial evidence.

### 1.    *The Requirements of Listing 12.05(C)*

Listing 12.05 describes the criteria necessary to establish disability based on mental retardation. The ALJ's decision that Henderson does not meet the criteria of Listing 12.05(C) is at issue in this case. That provision states, in relevant part:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

*      *      *

13

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05.  Therefore, in order to satisfy Listing 12.05(C), Henderson must show:  (1) that he experiences significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested prior to age 22 (i.e., the diagnostic description); (2) that he has a "valid verbal, performance, or full scale IQ of 60 through 70"; and (3) that he suffers from "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  *See West v. Comm'r Soc. Sec. Admin.*, 240 F. App'x 692, 697-98 (6th Cir. 2007).

### 2. The ALJ's Conclusion that Henderson Does Not Meet the Criteria of Listing 12.05(C) is Not Supported by Substantial Evidence

In this case, the ALJ found that "the 'paragraph C' criteria of listing 12.05 are not met because [Henderson] does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  (Tr. 16).  Later in his decision, the ALJ also found that Henderson "did not exhibit the requisite deficits prior to age twenty-two" and therefore did not satisfy the diagnostic description.  (Tr. 17).  Henderson challenges each of these conclusions.

### a. The Diagnostic Description

As set forth above, the introduction to Listing 12.05 states:  "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., *the evidence demonstrates or supports onset of the impairment before age 22*."  20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05 (emphasis added).  In this case, the ALJ concluded that Henderson did not satisfy Listing 12.05's diagnostic description because "he did not exhibit the requisite deficits prior to age 22."  (*Id.*).  This finding

14

is not supported by substantial evidence.

Henderson presented significant evidence that the onset of his severe impairments (learning disorder and cognitive disorder) occurred prior to age 22. Indeed, the ALJ specifically referenced Henderson's IQ tests from 1990, 1993, and 1996 (when Henderson was of school age), finding that they resulted in "IQ scores less than 70 and less than 60." (Tr. 16). These IQ scores alone would seem to provide evidence of "onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.05. However, the ALJ rejected these scores, concluding that they "are not considered a valid representation of [Henderson's] IQ." (Tr. 16). In reaching this conclusion, the ALJ stated:

> Social Security Administration regulations state that "IQ tests must be current for accurate assessment … IQ tests obtained between ages 7 and 16 should be considered current for … 2 years when the IQ score is 40 or above" (20 CFR Part 404, Subpart P, Appendix 1, § 112.00(D)(10)). Therefore, the IQ scores from 1990, 1993 and 1996, which were obtained when [Henderson] was nine, twelve and fifteen years old respectively, are not current and cannot be considered valid.

(*Id.*). The ALJ's analysis misses the mark.

In rejecting Henderson's IQ scores from the 1990's as "not current" and therefore invalid, the ALJ cited 20 CFR Pt. 404, Subpt. P, Appendix 1, § 112.00(D)(10). (Tr. 16). As Henderson argues, however, that regulation applies to claims of mental disability for children under age eighteen (Listing 112.05), not claims of adult mental disability (which are covered by Listing 12.05). (Doc. #11 at 13-14). In *Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 460-61 (6th Cir. 2012), the Sixth Circuit explicitly recognized this distinction, holding that §112.00(D)(10) of Appendix 1, which requires that IQ test results be sufficiently current, applies only to childhood claims of disability brought under Listing 112.05, not claims of adult mental disability brought under Listing 12.05. Despite Henderson's reliance on this case, the Commissioner made no effort to distinguish it or otherwise explain why it does not apply here. Indeed, *Dragon* seems

15

directly on point and confirms that the ALJ erred in rejecting as "not current" the results of Henderson's IQ test results from 1990, 1993, and 1996.

Moreover, the results from these early IQ tests clearly are relevant to whether Henderson satisfies the diagnostic description of Listing 12.05, *i.e.*, whether he has shown "onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05. In *Dragon*, the adult claimant presented evidence of IQ testing performed when she was twelve years old, resulting in a verbal IQ score of 65, a performance IQ score of 72, and a full scale IQ score of 66. *Id.* "The ALJ disregarded these scores because 'this testing was 14 years ago and occurred while [Dragon] was a child.'" *Id.* at 461. The Sixth Circuit held that this was error. In reaching this conclusion, the court specifically said, "Disregarding the scores on this ground misconstrues the relevance of the scores; **indeed, an older score was relevant to establish the manifestation of Dragon's impairment before the age of 22**." *Id.* (emphasis added). The same is true here.

In addition to Henderson's IQ scores, the record contains other evidence of "deficits in adaptive functioning initially manifested during the developmental period." 20 CFR Pt. 404, Subpt. P, App. 1, §12.05. "Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills." *West*, 240 F. App'x at 698. In this case, there is evidence of Henderson's deficits in these areas prior to age 22. For example, Henderson was enrolled in special education classes throughout high school (twenty out of thirty hours each week). (Tr. 290, 298). Testing completed when Henderson was an eighteen-year-old high school student revealed that he was performing at the third grade level in reading, spelling, and math. (Tr. 313-14). This is evidence of a significant deficit in Henderson's functional academic skills. *See Breitenstein v. Astrue*, 2011 WL 1235018, at *13 (S.D. Ohio Jan. 6, 2011) (deficits in functional academic skills relevant in determining whether claimant has deficit in

adaptive functioning).  The Court also notes that Henderson has never lived independently (moving from his adoptive mother's home to prison to a group home), which further evidences his deficits in adaptive functioning.  (Tr. 239, 331).

In response to Henderson's arguments on this issue, the Commissioner asserts that "the ALJ concluded that Plaintiff lacked the deficits in adaptive functioning that is required under the basic criteria for every mental retardation listing."  (Doc. #12 at 19 (citing Tr. 18)).  However, a review of the cited portion of the ALJ's decision (Tr. 18) reveals that the ALJ actually made no finding as to Henderson's adaptive functioning.  Although the Commissioner points to Henderson's ability to perform household chores, shop, and prepare simple meals as evidence that he had no deficits in adaptive functioning, the fact remains that the ALJ never performed this analysis, and "counsel's argument cannot cure a deficient opinion by offering explanations never offered by the ALJ." *Oddo v. Astrue*, 2012 WL 7017622, at *6 (N.D. Ohio Dec. 10, 2012).

For all of these reasons, the ALJ's conclusion that Henderson did not satisfy the diagnostic description by demonstrating "the requisite deficits prior to age twenty-two" (Tr. 17) is not supported by substantial evidence.

> b.    *Valid IQ Score*

Listing 12.05(C) also requires evidence of a "valid verbal, performance, or full scale IQ of 60 through 70."  20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05.  The regulations further provide that, "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05."  *Id.* at §12.00(D)(6)(c).

In this case, as the ALJ noted, Henderson's "test results from 1990, 1993 and 1996

17

include [] IQ scores less than 70 and less than 60." (Tr. 16). As set forth above, however, the ALJ relied on an inapplicable provision of the child disability regulations in concluding that these scores are "not current and cannot be considered valid." (*Id.*). *See* Section F(2)(a), *supra.*

Even ignoring for the moment these childhood IQ test results, however, the ALJ correctly found that more recent testing, conducted by Dr. Van Horn on June 25, 2010, showed that Henderson has "a full-scale IQ of 70." (Tr. 17 (citing Tr. 349)). This would appear to satisfy the requirements of Listing 12.05(C) as well. The ALJ apparently disputed the validity of this test score, however, suggesting that Henderson's "cognitive ability is actually somewhat greater than indicated by the results of the June 2010 testing." (Tr. 17). In that respect, the ALJ noted that "although [Henderson's] grades were likely at least partially inflated by his part-time participation in special education (twenty out of thirty hours per week per Ex. 2F, pg. 8), he graduated high school in June 2000, with a grade-point average of 2.942 …." (*Id.*).

Henderson argues that the ALJ erred in disregarding his June 2010 IQ scores. In support of his argument, Henderson again relies on *Dragon*. In that case, the Sixth Circuit considered a similar situation, where the ALJ disregarded the claimant's IQ scores (which ranged from 50-58), finding that they were "underestimates of [Dragon's] intellectual functioning." *Dragon*, 470 F. App'x at 461. The court noted that, "The ALJ may choose to disregard I.Q. scores that would normally lead to a finding of disability when those scores were undermined by a doctor's full evaluation." *Id.* at 462. However, that was not the case in *Dragon*, where the ALJ "disregarded [the doctor's] full evaluation, which served to reinforce the I.Q. scores, rather than undermine them." *Id.*

The same is true here, where no medical or psychological evaluation undermines Dr. Van Horn's test results and, indeed, her own evaluation (to which the ALJ gave "significant weight")

18

clearly reinforces them.  (Tr. 20).  Dr. Van Horn considered Henderson's IQ scores "reliable for interpretation" and specifically stated:   "Mr. Henderson's intellectual level is consistent with previous performance and there is a likelihood it is not going to change over time."  (Tr. 348-49).  In addition, Dr. Van Horn noted that Henderson could read at only the sixth grade level, spell at the fifth grade level, and perform arithmetic at the fourth grade level.  (Tr. 349).  Again, Dr. Van Horn specifically stated that, "His poor achievement scores are consistent with previous scores at school and during his incarceration."  (*Id.*).

Given these facts, the ALJ erred in finding that Henderson's graduation from high school, with a "partially inflated" grade point average of 2.942, undermines the results of his June 2010 IQ testing.   It is clear from the record that Henderson's high school graduation was accommodated by a significant percentage of special education classes (as the ALJ noted, twenty out of thirty hours per week).  (Tr. 17).  Moreover, an examination of Henderson's high school transcript confirms that his highest grades almost invariably came in courses designated as "BEST," *i.e.*, part of the special education curriculum.  (Tr. 290, 301).  In *Dragon*, the Sixth Circuit considered similar facts, where the ALJ had rejected the claimant's low IQ scores, finding that, "[T]he fact that [Dragon] was able to graduate from high school, albeit with an individualized education plan, is not consistent with mental retardation."  *Id.* at 462.  The Sixth Circuit disagreed, stating:

> In this case, the ALJ reasoned that, because Dragon was a high school graduate and a mother, her I.Q. scores were invalid.  Given the record here, these things cannot be held against her.  She graduated from high school on an individual education plan and never passed her ninth grade proficiency tests ….  Because Dragon's activities are not inconsistent with her tested I.Q. scores and Dragon's performance during [the doctor's] evaluation was not inconsistent with her tested I.Q. scores, the ALJ's decision to invalidate the I.Q. scores was not supported by substantial evidence.

*Id.* at 463.  The same is true here, where Henderson's IQ scores are both consistent with his

results on previous IQ tests and with the remainder of Dr. Van Horn's evaluation.  Other courts have held that "the fact that an individual is able to live successfully in the community and possesses the skills necessary for minimum self-support does not preclude a diagnosis of mild mental retardation, nor does it support invalidating corresponding IQ scores of 70 or below." *Grillot v. Astrue*, 2012 WL 5493969, at *10 (S.D. Ohio Nov. 13, 2012); *see also Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 269 (6th Cir. 1991) (certain activities – such as the use of public transit, making change at the grocery store, doing laundry, cleaning, and limited reading comprehension – are not necessarily inconsistent with a valid test IQ of 68).  Thus, to the extent the ALJ found that Henderson's June 2010 full scale IQ score of 70 did not satisfy the requirements of Listing 12.05(C), such a conclusion is in error.

c.  *"Other Mental Impairment"*

In order to meet Listing 12.05(C), in addition to a valid IQ score from 60 through 70, Henderson must show the existence of "a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05(C).  As this Court recently explained:

> The additional impairment required at this stage of the analysis "need not be disabling in and of itself," but the Social Security regulations explain that it must be "a 'severe impairment, as defined in §§404.1520(c) and 416.920(c).'"   Based on this regulation, an impairment that is deemed "severe" under 20 C.F.R. §416.920(c) necessarily constitutes a significant additional limitation.  Therefore, this prong of the paragraph C criteria is met if the ALJ finds, at Step 2 of the sequential disability analysis, that the claimant suffers from a severe physical or mental impairment that is distinct from the claimant's low IQ.

*Hutchinson v. Comm'r of Soc. Sec.*, 2013 WL 4604561, at *15 (E.D. Mich. Aug. 29, 2013) (internal citations omitted).

In this case, the ALJ specifically found that, in addition to Henderson's cognitive disorder, he has another severe impairment, namely a "learning disorder."  (Tr. 14).  Based on

the Social Security Administration's own regulations, "an impairment that is deemed 'severe' necessarily constitutes a significant additional limitation."  *Id.* at *15; *see also Oddo*, 2012 WL 7017622, at *4.  The ALJ ruled differently, however, concluding that Henderson's learning disorder does not constitute an "other mental impairment" for purposes of Listing 12.05(C).  (Tr. 17).  In reaching this conclusion, the ALJ said only:  "Specifically, both of Claimant's severe impairments (learning disorder and cognitive disorder) both fall squarely within the confines of listing 12.05 and cannot properly be considered as 'other mental impairment[s].'"  (*Id.*).  There are several problems with the ALJ's conclusion in this regard.

First, as Henderson points out, shortly after he reached this conclusion, the ALJ also said:

> Additionally, the school psychologists reported that Claimant's learning disorders were <u>not</u> the result of mental retardation and noted that his "academic achievement is significantly below expectations considering his cognitive abilities."  This is further indication that Claimant's learning disorder is not the result of an organic mental impairment.

(*Id.*) (citations omitted).  Clearly, then, these portions of the ALJ's opinion are inherently inconsistent.  If, as the ALJ states, Henderson's learning disorder "is not the result of an organic mental impairment," and his learning disability was "<u>not</u> the result of mental retardation," then his conclusion that both of these impairments "fall squarely within the confines" of the mental retardation listing would appear not to be supported by substantial evidence.

Moreover, aside from the apparent inconsistency in the ALJ's reasoning, the fact remains that the ALJ did not adequately explain why these two separate and distinct severe impairments both fall within the confines of Listing 12.05(C).  As this court has held, "assuming *arguendo* that finding an impairment is 'severe' at Step 2 does not mandate a *per se* finding that such an impairment imposes a significant work related limitation, under Listing 12.05(C), the ALJ should, at least, discuss the distinction between the two."  *Hutchinson*, 2013 WL 4604561 at *15.

An additional mental impairment satisfies the requirement of §12.05(C) when "its effect

on a claimant's ability to perform basic work activities is more than slight or minimal." *Fanning v. Bowen*, 827 F.2d 631, 633 (9th Cir. 1986).   Basic work activities include "… (3) understanding, carrying out, and remembering simple instructions, (4) use of judgment, (5) responding appropriately to supervision, co-workers and usual work situations, and (6) dealing with changes in a routine work setting."   20 C.F.R. §404.1521(b).   In this case, the ALJ did not discuss how – if at all – Henderson's learning disorder would impact his ability to perform these basic work activities.   Rather, he simply concluded, without further explanation or rationale, that this impairment fell "squarely within the confines of listing 12.05."   (Tr. 17).   This is insufficient.   *See, e.g., Oddo*, 2012 WL 7017622, at *5 (since the ALJ already found other impairments to be "severe" at Step 2, the ALJ's subsequent finding – that plaintiff did not suffer from other physical or mental impairments – is not supported by substantial evidence); *Breitenstein,* 2011 WL 1235018, at *13 (finding that because the ALJ's decision acknowledged the existence of other severe impairments – stuttering and depression/anxiety – the "physical or other mental impairment" requirement of Listing 12.05(C) was satisfied).

The Commissioner offered nothing more than a cursory justification of the ALJ's finding on this issue, saying only, "In any event, the ALJ considered evidence of [Henderson's] learning disorder and cognitive disorder, but noted that they fell within the confines of Listing 12.05 insofar as they had bearing on his intellectual function, and did not fall under the category of other mental impairment."   (Doc. #12 at 20 (citing Tr. 17)).   In a similar case, however, a court explicitly rejected such an approach.   In *Williams v. Astrue*, 2008 WL 4755348, at *10 (S.D.N.Y. Oct. 27, 2008), the court was evaluating the claimant's impairments in the context of Listing 112.05 (mental retardation in children), noting that that listing required a valid IQ score, as well as "a physical or other mental impairment imposing an additional and significant limitation of

function" (the same requirement at issue in the instant case). *Id.* The ALJ concluded that the plaintiff's "learning disorder did 'not qualify as an 'other' impairment from borderline intellectual functioning, as they are essentially one and the same.'" *Id.* at *8. The court disagreed, stating: "It is plain that mental retardation is different from a learning disorder." *Id.* at *10. Thus, the *Williams* court remanded the case to the ALJ for a more thorough analysis of the distinctions between these two disorders and their effects on the plaintiff's functioning. *Id.* at *11. In this case too, it is conceivable that Henderson's learning disorder could cause significant and additional limitations – above and beyond those of his cognitive disorder – such that it would constitute an "other mental impairment." On remand, the ALJ should, at a minimum, discuss the distinction between these two disorders and explain their effects on Henderson's functioning. *Id.*

Finally, Henderson asserts that the ALJ erred in concluding that his pedophilia is a non-severe impairment. (Doc. #11 at 18-19). Generally, this argument would not raise more than harmless error for two reasons: (1) an ALJ's determination that a particular condition is non-severe is harmless "where he found the existence of other severe impairments and proceeded to Step Three" as happened here, *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); and (2) the RFC imposed by the ALJ prohibited Henderson from performing work in which he would have contact with children. However, because Henderson could meet Listing 12.05(C) by showing an additional "mental impairment" that is "severe," 20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05(C); *Hutchinson*, 2013 WL 4604561, at *15, remand would be required if the ALJ's conclusion that Henderson's pedophilia was not a "severe" impairment was not supported by substantial evidence.

In his decision, the ALJ noted that Henderson has been diagnosed with pedophilia, but then concluded that this impairment is non-severe, saying, "Claimant has reported that he is no

longer prone to pedophilia and indicates that he is not likely to be a recidivist."  (Tr. 14).  However, his self-report is contradicted by various pieces of record evidence.  For instance, Dr. Van Horn found that Henderson's "[p]edophilia should be a concern as he may repeat the same behavior."  (Tr. 350).  Also, at the time of the administrative hearing Henderson was still in sex offender treatment, where it was noted that he was "considered a Medium-High risk for recidivism," and that, even with treatment, "his prognosis not to re-offend is guarded."  (Tr. 470).  Finally, the ALJ found Henderson's pedophilia a severe enough impairment to include in his RFC a limitation that Henderson be "precluded from contact with children."  (Tr. 17).  Generally, it would seem that a mental impairment that necessitates a significant limitation on a claimant's ability to work has more than a minimal effect on his ability to perform basic work activities (and, thus, is severe).  *See Soc. Sec. Rul.* 96-3p, 1996 WL 374181, at *2 (July 2, 1996).  Particularly in light of the ALJ's finding that Henderson suffers from a severe cognitive disorder (Tr. 14), the ALJ should have weighed Henderson's self-report against this other record evidence.  The ALJ's failure to do so precludes the Court from finding that his conclusion that Henderson's pedophilia is not a "severe" impairment is supported by substantial evidence.

In sum, the ALJ's conclusion that Henderson did not establish the presence of an "other mental impairment" is not supported by substantial evidence.

## III.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [12] be DENIED, Henderson's Motion for Summary Judgment [11] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits, and that this case be remanded to the ALJ for further proceedings consistent with this Recommendation.

Dated: March 11, 2014                         s/David R. Grand
Ann Arbor, Michigan                           DAVID R. GRAND
                                              United States Magistrate Judge

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 11, 2014.

                                              s/Felicia M. Moses
                                              FELICIA M. MOSES
                                              Case Manager